# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JAMES BOLAND, *et al.*, | : | | |
| | : | | |
| Plaintiffs/Counterclaim-Defendants, | : | Civil Action No.: | 13-0739 (RC) |
| | : | | |
| v. | : | Re Document No.: | 7 |
| | : | | |
| WASCO, INC., *et al.*, | : | | |
| | : | | |
| Defendants/Counterclaim-Plaintiffs. | : | | |

## MEMORANDUM OPINION

### GRANTING PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS

## I. INTRODUCTION

The plaintiffs in this action are James Boland and several other Trustees ("Trustees") of the Bricklayers & Trowel Trades International Pension Fund ("IPF"). The IPF is an employee benefit plan and a multiemployer plan as defined under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Compl. ¶¶ 1, 3, ECF No. 1. Defendants Wasco Inc. and Lovell's Masonry (hereinafter collectively referred to as "WASCO") are building and construction industry employers who conduct business in Tennessee, and employ members of the Bricklayers & Trowel Trades International Union. *See id.* ¶¶ 4–6. The Trustees brought this action against WASCO pursuant to ERISA, seeking interim payments and enforcement of the terms of certain collective bargaining agreements between the parties. WASCO, meanwhile, counterclaimed, alleging violations of ERISA, the Labor-Management Relations Act ("LMRA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* Countercl. ¶¶ 39–50, ECF No. 5. Pending before the Court is the Trustees' motion to dismiss WASCO's counterclaims. *See* ECF No. 7. For the reasons that follow, the Court will grant that motion.

## II. FACTUAL BACKGROUND & STATUTORY SCHEME

### A. ERISA & MPPAA

Employer withdrawal liability was established by Congress in the Multiemployer Pension Plan Amendments Act ("MPPAA"), which made various amendments to ERISA. "ERISA, as amended by the MPPAA, provides an elaborate system to ensure the financial integrity of multiemployer pension funds." *Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1120 (D.C. Cir. 1989). "Congress passed the MPPAA in part because employers' withdrawals from multiemployer pension plans threatened those plans' solvency, and thus their ability to ensure that beneficiaries would ultimately receive benefits that were their due." *Id.*

Under the MPPAA, a building and construction industry employer "withdraws" from a multiemployer pension plan if (a) "an employer ceases to have an obligation to contribute under the plan," and (b) "the employer continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases." 29 U.S.C. § 1383(b)(2). "When an employer withdraws from a multiemployer plan," the plan sponsor is to "(1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability, and (3) collect the amount of the withdrawal liability from the employer." 29 U.S.C. § 1382.

### B. Parties in This Case

On December 19, 2011, the IPF determined that Wasco Inc. and Lovell's Masonry had withdrawn from the IPF within the meaning of 29 U.S.C. § 1383(b) of ERISA, and therefore sent Wasco Inc. and Lovell's Masonry letters notifying them of their liability under 29 U.S.C. §§ 1381, 1383(b), and 1399. *See* Compl. ¶ 9. Under the notices sent to Wasco Inc. and

Lovell's Masonry, Wasco Inc. was obligated to pay the IPF $36,082.71 per month for 240 months beginning in February 2012, and Lovell's Masonry was obligated to pay $11,430.63 to the IPF for 153 months beginning in February 2012. *See* Compl. ¶¶ 10–11. WASCO made the first 12 payments, but failed to make any other payments under the payment schedules. As a result, the Trustees sent WASCO warning letters, seeking immediate payment of all outstanding withdrawal liability payments. *See id.* ¶ 13. When WASCO did not initiate any other payments, the Trustees filed the instant action, demanding the interim payment amounts, interest, liquidated damages, attorney's fees, and costs. *See* Compl. at 5–6.

WASCO, in turn, counterclaimed, alleging that the Trustees have conducted two audits of it since the late 1970s and that the "audit results were in each instance improperly inflated by demands for payment for work done by supervisors and other ineligible individuals." *See* Countercl. ¶¶ 33–35. WASCO asserted the following three counterclaims: (1) violation of ERISA, "by causing WASCO[1] to pay more in pension contributions to the Fund than were actually owed and by increasing the amount of its withdrawal liability assessment"; (2) violation of LMRA, for demanding "payments by an employer to an employee representative the detailed basis for which was not set forth in a written agreement with the employer"; and (3) violation of the RICO Act. *See* Countercl. ¶¶ 39–50. The Trustees have moved to dismiss these counterclaims, arguing that (1) all counterclaims must be dismissed because WASCO was required to exhaust the arbitration process mandated by the MPPAA, (2) the LMRA claim must be dismissed because any LMRA violation is belied by WASCO's own pleading, and in any event, damages are not recoverable under 29 U.S.C. § 186, and (3) the RICO count must be

---

[1]       In the Counterclaim, the defendants/counterclaim-plaintiffs use the term "WASCO" to refer to both Wasco, Inc. and Lovell's Masonry, Inc. *See* Counterclaim ¶ 25, ECF No. 5. For the sake of consistency, the Court does the same.

dismissed because WASCO has not alleged a pattern of racketeering activity.  *See generally* Pls.'

Mem. Supp. Mot. to Dismiss Countercl.  The Court analyzes each argument in turn.

### III.  ANALYSIS

#### A.  Legal Standard

"Under Federal Rule of Civil Procedure 12(b)(6), a counter-defendant may file a motion

to dismiss to test 'the sufficiency of the allegations within the four corners of the complaint after

taking those allegations as true.'"  *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 901 F.

Supp. 2d 136, 139 (D.D.C. 2012); *see also Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F.

Supp. 2d 128, 134 (D.D.C. 2009) ("The same standards [that govern a motion to dismiss a

complaint] govern a motion to dismiss with respect to an opposing party's counterclaims.").

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

sufficiency of a complaint," *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), or in this

case, a counterclaim.  The motion does not test a plaintiff's ultimate likelihood of success on the

merits, but only forces the court to determine whether a plaintiff has properly stated a claim.

*ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 467 (D.C. Cir. 1991).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 562 (2007).  A claim is facially plausible when the pleaded factual content "allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

The court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *See Warren v. District of Columbia*, 353 F.3d 36, 39–40 (D.C. Cir. 2004); *Browning*, 292 F.3d at 242. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## B.  WASCO Has Not Exhausted the Mandatory Arbitration Process

The Trustees' first argument is that WASCO's counterclaims must be dismissed because WASCO failed to raise those counterclaims in arbitration as mandated by the MPPAA before it brought them in federal court. *See* Pls.' Mem. Supp. Mot. to Dismiss Countercl. 4–10.  They argue that the D.C. Circuit's decision in *Grand Union Co. v. Food Employers Labor Relations Ass'n*, 808 F.2d 66 (D.C. Cir. 1987), controls this case, and that neither exception to the mandatory arbitration rule recognized in that case applies.  They also argue that the LMRA and RICO claims must be submitted to arbitration before being brought in federal court because "[t]he issue of whether the withdrawal liability assessment was correct is . . . crucial to" all three of WASCO's counterclaims. *See* Pls.' Mem. Supp. Mot. to Dismiss Countercl. 9.  WASCO, in turn, argues (1) that its claims do not concern withdrawal liability, but rather fall outside the scope of the MPPAA arbitration mandate, (2) that it is entitled to have its claims of illegality heard by this Court, and (3) that arbitration of its claims would be futile. *See* Defs.' Resp. Mot. to Dismiss Countercl. 3–7.  The Court agrees with the Trustees that all of WASCO's counterclaims must first be submitted to arbitration and that regardless, there is no illegality or futility requiring the Court to hear WASCO's claims before an arbitrator does.

The MPPAA establishes both informal and formal dispute resolution procedures with respect to withdrawal liability owed by the employer.  First, the MPPAA provides that an

employer "may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments," and "may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer." 29 U.S.C. § 1399(b)(2)(A). In the event informal channels do not end the dispute, the MPPAA mandates that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall be resolved through arbitration.*" 29 U.S.C. § 1401(a)(1) (emphasis added). After the arbitration process has been completed, "any party . . . may bring an action . . . in an appropriate United States district court . . . to enforce, vacate, or modify the arbitrator's award." *Id.* § 1401(b)(2).

The Trustees appropriately analogize this case to *Grand Union*. In that case, Grand Union commenced an action in federal court, challenging a certain exemption from withdrawal liability to which it believed it was entitled, without first resorting to arbitration. 808 F.2d at 67. Grand Union also asserted a breach of fiduciary duty claim against the Fund and the trustees of the Fund. *Id.* The district court dismissed Grand Union's withdrawal liability claims on the grounds that it had to first go through arbitration as mandated by the MPPAA. *Id.* It also dismissed Grand Union's breach of fiduciary duty claim "for failure to state a claim within the federal court's subject matter jurisdiction." *Id.* at 67–68. In affirming the district court, the D.C. Circuit explained that "*initial recourse to arbitration is a statutory direction*, one generally to be followed unless neither party timely presses the plea in abatement, *and* the court finds that deferring a court contest while the parties repair to arbitration 'will neither lead to the application of superior expertise nor promote judicial economy.'" *Id.* at 70 (first emphasis added) (quoting

*I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1210 (D.C. Cir. 1984)).[2]

In this case, neither exception to the mandatory arbitration rule applies. First, there is no indication that either party has waived arbitration. That stance is not pled by WASCO, nor argued against in its opposition to this motion. Nor, as the Trustees persuasively argue, does the Trustees' filing of the present action represent waiver or abandonment of arbitration. The Trustees need not resort to arbitration with respect to employer liability because they are demanding interim payments of withdrawal liability, and the MPPAA provides plan beneficiaries with access to the federal courts when they are "adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan." 29 U.S.C. § 1451(a)(1). Additionally, a plan beneficiary is entitled to bring a civil action when an employer fails to comply with the interim payment requirement because that failure "shall be treated in the same manner as a delinquent contribution" under 29 U.S.C. § 1145, *id.* § 1451(b), for which the fund is entitled to bring a civil action under 29 U.S.C. § 1451(a)(1) and 29 U.S.C. § 1132(g)(2).

Moreover, the MPPAA itself notes that withdrawal liability is statutorily mandated, and shall be payable "notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule." 29 U.S.C. § 1399(c)(2). Cases interpreting 29 U.S.C. § 1399 all agree that the "pay now, dispute later principle of the MPPAA is well

---

[2] Although WASCO argues otherwise, *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204 (D.C. Cir. 1984), is not to the contrary. The court in that case concluded that MPPAA's arbitration requirement was "a prudential matter rather than a jurisdictional bar." *Id.* at 1209. But the *Grand Union* court clarified and narrowed *Stockton*, explaining that "*Stockton* is a case in which the party so tardily pleading arbitration had effectively waived the right to do so, and in which other facts did not impel the court to delay adjudication." 808 F.2d at 70. The *Grand Union* court went on to conclude, as set forth above, that "'[a]rbitrate first' is indeed a rule Congress stated unequivocally." *Id.*

established." *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d

495, 507 (3d Cir. 1992); *see also Trs. of United Mine Workers of Am. 1974 Pension Plan v.*

*Morrison Knudsen Corp.*, 931 F. Supp. 4, 8 (D.D.C. 1996) (internal quotation marks omitted)

("The meaning of these provisions is unambiguous: employers are required to make withdrawal

liability payments during the pendency of any dispute."); *Connors v. Calvert Dev. Co.*, 622 F.

Supp. 877, 879 (D.D.C. 1985) ("The law is clear that withdrawal liability payments must be

made by an employer according to the plan's schedule even if the employer disputes the liability.

The importance of providing plan trustees with an efficient procedure to insure continued

funding upon an employer's withdrawal is noted clearly at Section 1399(c)(2)."). Thus, the

Trustees' initiation of this action does not constitute waiver of the arbitration requirement

because the Trustees are entitled to bring their action for interim payments in federal court under

29 U.S.C. § 1451, rendering the waiver exception to arbitration inapplicable.[3]

    The other exception to the arbitration requirement also does not apply here, because

arbitration of WASCO's claims would likely lead to application of superior expertise and

promote judicial economy. In the arbitration, the employer would be able to put forth evidence

challenging the withdrawal liability determination. *See* 29 U.S.C. § 1401(a)(3)(A) ("[A]ny

determination made by a plan sponsor . . . is presumed correct unless the party contesting the

determination shows by a preponderance of the evidence that the determination was

unreasonable or clearly erroneous."). The arbitrator, armed with more institutional expertise,

---

[3]    It appears that arbitration proceedings are currently ongoing between the parties. *See* Answer ¶ 15 ("Defendants . . . deny the allegation that they have not yet initiated arbitration."); Pls.' Mem. Supp. Mot. to Dismiss Countercl. 6 ("Defendants themselves requested arbitration in this case, and counsel for the IPF has negotiated with counsel for Defendants regarding selection of an arbitrator to handle the arbitration."). Indeed, while WASCO's arbitration claims are pending, WASCO must still pay the withdrawal liability amounts under the clear language of the MPPAA.

would be able to find facts regarding the withdrawal liability amount, which would provide for a more robust record when and if that decision is challenged in federal court. *See Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 101 (D.D.C. 2008) (quoting *Connors v. B.M.C. Coal Co.*, 634 F. Supp. 74, 75 (D.D.C. 1986)) ("[D]etermining the appropriate calculation of the underlying withdrawal liability and payment schedule are properly addressed first via arbitration because they 'are quintessentially within the expertise of an arbitrator skilled in pension matters.'"). This would promote judicial economy because it would streamline the fact-finding process, as a court would have to defer to the arbitrator's findings unless they were erroneous based on a preponderance of the evidence. *See* 29 U.S.C. § 1401(c) ("[T]here shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."). Arbitration would also streamline the issues—if the arbitrator determines that the withdrawal liability determination was proper, that conclusion would necessarily resolve all of WASCO's counterclaims, including, at least in part, the LMRA and RICO claims. Thus, arbitration is the appropriate forum for the defendants to challenge the withdrawal liability determination, in accordance with Congress's preference for arbitration. *See I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Clinton Engines Corp.*, 825 F.2d 415, 422 (D.C. Cir. 1987) (concluding that "arbitration reigns supreme under the MPPAA").

Indeed, WASCO does not argue that either of the *Grand Union* arbitration exceptions apply here. Rather, WASCO argues that it is not subject to the mandatory arbitration procedures because its counterclaims do not concern a determination of withdrawal liability. *See* Defs.' Resp. Mot. to Dismiss Countercl. 4–5. WASCO argues instead that its counterclaims involve allegations that the "Trustees committed indictable offenses by knowingly making unfounded

and extortionate[4] demands for payments unsupported by any written agreement between WASCO and the Union," which "fall outside the scope of Section 1401." *Id.* at 4.

The Court does not agree with WASCO's characterization of its counterclaims. WASCO alleges that since the 1970s, the Fund has conducted two audits of WASCO. *See* Countercl. ¶¶ 33–34. WASCO alleges that the "audit results were in each instance improperly inflated by demands for payment for work done by supervisors and other ineligible individuals, for work done outside the Union's jurisdiction and outside the area covered by WASCO's collective bargaining agreements, and for work performed by laborers for whom no contributions were owed under the collective bargaining agreements." *Id.* ¶ 35. WASCO also alleges that the "withdrawal liability calculations were inflated because they included the amounts improperly demanded and paid in response to the first audit and the amounts improperly demanded in the second audit." *Id.* ¶ 38. The three causes of action alleged by WASCO all turn on this alleged "inflated" nature of withdrawal liability. *See id.* ¶ 40 (claiming that the Trustees violated ERISA "by causing WASCO to pay more in pension contributions to the Fund than were actually owed and *by increasing the amount of its withdrawal liability assessment*") (emphasis added); ¶ 43 (claiming that "WASCO has been damaged by the Trustees' actions *because it has had to pay more in pension contributions* to the Fund than was actually owed and because the improper

---

[4] Courts have recognized exceptions to the arbitration requirement where fraud, misrepresentation, or both are alleged. *See Carl Colteryahn Dairy, Inc. v. W. Pa. Teamsters & Emp'rs Pension Fund*, 847 F.2d 113, 119 (3d Cir. 1988) (stating that a claim that an employer was fraudulently induced to become and remain a contributing member of the Fund "differs significantly from the types of highly technical MPPAA issues that the statute has assigned to arbitration," and as such, need not be arbitrated before being brought in federal court). However, WASCO does not allege that it was fraudulently induced into entering into the collective bargaining agreements and, at bottom, all of the claims center around the withdrawal liability amounts requiring application of the highly technical MPPAA issues. As such, this exception is inapposite.

demands and *payments increased the amount of its withdrawal liability assessment*") (emphasis added); ¶ 50 (claiming that "WASCO has been injured by having to *pay more in pension contributions and withdrawal liability to the Fund than was actually owed* and by having to pay legal and other expenses that it would not otherwise have incurred") (emphasis added).  In other words, the three causes of action asserted by WASCO all turn on what it believes to be inflated withdrawal liability amounts.  Thus, WASCO's argument that its counterclaims do not concern withdrawal liability is incompatible with the counterclaim allegations themselves.  As set forth above, such claims must be arbitrated before being brought to federal court.

WASCO's decision to frame two of the counterclaims as LMRA and RICO violations does not change this result, because those counterclaims are so related to the underlying determination of withdrawal liability that they, like the ERISA counterclaim, must be arbitrated first.  The LMRA counterclaim alleges that the Trustees' "demand for or an acceptance of payments . . . the detailed basis for which was not set forth in a written agreement with the employer" resulted in WASCO having "to pay more in pension contributions to the Fund than was actually owed and . . . *increased the amount of its withdrawal liability assessment*."  *Id.* ¶¶ 42–43 (emphasis added).  Similarly, the RICO counterclaim alleges that the alleged pattern of racketeering activity conducted by the Trustees has resulted in WASCO "*having to pay more in pension contributions and withdrawal liability* to the Fund than was actually owed."  *Id.* ¶ 50 (emphasis added).  The resolution of the withdrawal liability determination issue in arbitration, then, will necessarily resolve, in part, the LMRA and RICO claims.  Courts have adhered to the plain language of 29 U.S.C. § 1401 in requiring "*any dispute*" and *any defense related to withdrawal liability* to be arbitrated before being brought to federal court.  *See Vaughn v. Sexton*, 975 F.2d 498, 501 (8th Cir. 1992) ("The courts holding that all defenses are barred if not initially

arbitrated cite several reasons for so ruling . . . [including] the fact that 29 U.S.C. § 1401 declares that 'any dispute' concerning a determination *related to a withdrawal liability* assessment is to be arbitrated . . . .") (emphasis added); *Cent. States, Se. & Sw. Areas Pension Fund v. MGS Transp., Inc.*, 661 F. Supp. 54, 57 (N.D. Ill. 1987) (explaining that "[a]lthough at least two of their defenses touch upon portions of ERISA other than sections 1381 to 1399, *each of the three defenses relates to the existence of defendants' liability*" and as such, "should have [been] arbitrated") (emphasis added).

To be sure, circuit courts have created certain narrow defenses that may be raised in federal court before having to be arbitrated, such as where the defense alleged presents a constitutional violation, a verifiable claim of irreparable injury, or a specific issue of statutory interpretation outside the MPPAA. *See Mason & Dixon Tank Lines, Inc. v. C. States, Se. & Sw. Areas Pension Fund*, 852 F.2d 156, 165 (6th Cir. 1988) (explaining that the MPPAA arbitration requirement "may not apply if the employer were 'mounting a facial constitutional attack or making a verifiable claim of irreparable injury'"); *N.Y. State Teamsters Conference Pension & Ret. Fund v. McNicholas Transp. Co.*, 848 F.2d 20, 22 (2d Cir. 1988) ("Notwithstanding the broad language of . . . [29 U.S.C. § 1401(a)], we have ruled that a matter need not be submitted to arbitration where the only disputes concern constitutional questions or, in some circumstances, statutory interpretation."). However, circuit courts are equally in agreement that merely couching a defense or counterclaim as an issue of statutory interpretation will not necessarily bypass arbitration. *See I.A.M. Nat'l Pension Fund, Plan A*, 825 F.2d at 418 ("From the unambiguous language by which Congress established the primacy of arbitration in withdrawal liability disputes and in light of our decisions interpreting those terms, it should be beyond cavil that the existence of an issue of statutory interpretation, standing alone, does not justify

bypassing arbitration.").  Instead, where there are questions of fact, or mixed questions of law and fact, they are to be resolved in arbitration.  *See Vaughn*, 975 F.2d at 502 ("Even the cases allowing certain defenses to bypass arbitration state that the existence of a question of statutory interpretation is not, by itself, sufficient to eliminate the arbitration requirement and that factual issues must always be arbitrated."); *T.I.M.E.-DC, Inc. v. Mgmt.-Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir. 1985) ("The Act subjects to arbitration factual issues the resolution of which is necessary to calculate withdrawal liability. These might include, for example, the number of employees covered or the dollar amount of benefits that have vested.  Disputes over these issues are not subject to judicial decision.").

Here, WASCO's counterclaims do not allege constitutional violations, verifiable claims of irreparable injury, or pure issues of statutory interpretation.  Rather, the central issue alleged in the LMRA and RICO counterclaims turns on the "inflated" withdrawal liability amount, and any violation of those statutes is predicated upon the withdrawal liability determination, which is best resolved by a fact-finding arbitrator.  Because those claims are so related to the withdrawal liability determination, they must be addressed in arbitration before being brought to federal court, as other district courts have aptly noted.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Houston Pipe Line Co.*, 713 F. Supp. 1527, 1535 (N.D. Ill. 1989) (dismissing defendants' LMRA counterclaim without prejudice because "an arbitrator will decide the fundamental issue of the counterclaim—whether the contribution provisions in the collective bargaining agreement violate § 302(c)(5) of the LMRA—in the context of Central States' demand for withdrawal liability"); *see also Gastronomical Workers Union Local 610 v. La Mallorquina, Inc.*, 597 F. Supp. 2d 265, 271 (D.P.R. 2009) (finding that the employer's counterclaim for damages under *both ERISA and the Puerto Rican Civil Code* "arises out of a dispute between itself and Plaintiffs

concerning a determination of withdrawal liability" and as such must be dismissed for failure to arbitrate) (emphasis added); *Trs. of The Sheet Metal Workers' Local Union No. 80 Pension Trust Fund v. W.G. Heating & Cooling*, 555 F. Supp. 2d 838, 848 (E.D. Mich. 2008) (finding that even though defendant did not have standing to bring a breach of fiduciary duty claim, the claim would nevertheless have to be dismissed for failure to arbitrate and explaining that "[b]ecause the defendant *seeks to contest the amount of its withdrawal liability by challenging the plan fiduciary's performance*, it should have initiated its complaint in accordance with 29 U.S.C. § 1401(a) in an arbitral forum") (emphasis added); *Chi. Truck Drivers Union Pension Fund v. Bhd. Labor Leasing*, 950 F. Supp. 1454, 1460–61 (E.D. Mo. 1996) (explaining that even though employers' state tort law counterclaims were preempted by ERISA, they would nevertheless first have to be arbitrated because the "thrust of defendants' proposed counterclaims is that the plaintiffs wrongfully determined the original amount of their withdrawal liability. This is just the type of dispute which Congress has required to be submitted to arbitration."). *Cf. Grand Union*, 808 F.2d at 71 (explaining even if the employer had asserted its breach of fiduciary duty claims under a section of ERISA giving it standing to sue, those counts still "could not be entertained, because Grand Union failed to arbitrate first").

WASCO next argues that it is entitled to have its defense of illegality decided by a federal court, relying on *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982). *See* Defs.' Resp. Mot. to Dismiss Countercl. 5–6. In that case, Kaiser Steel challenged certain contributions it had to make pursuant to collective bargaining agreements it had entered into. *Kaiser Steel*, 455 U.S. at 78. It argued that requiring it "to make contributions based on purchased coal would be to enforce a bargain that violates two different federal statutes, the Sherman Act and the NLRA." *Id.* The Supreme Court found that Kaiser Steel's defense of illegality was not precluded,

because section 306 of the MPPAA explicitly requires employers to contribute to pension funds only where doing so would not be inconsistent with law. *Id.* at 87–88. Because the employers' contribution in that case was allegedly inconsistent with antitrust law, that defense was able to be heard in federal court. WASCO's reliance on this case is inapposite. *Kaiser Steel* does not involve arbitration at all, only peripherally addresses the MPPAA, and pertains to a defense to a breach of contract claim. And to the extent it stands for the proposition that illegality defenses are able to be raised in federal court without first resorting to an arbitration proceeding—which the Court is not convinced it does—the facts of that case are distinguishable from this one. In that case, Kaiser Steel argued that complying with specific provisions of the collective bargaining agreements would be inconsistent with law—specifically antitrust law. And the Court there found that the statutory language of the MPPAA does not "implicitly repeal the antitrust laws, the labor laws, or any other statute which might be raised as a defense to a provision in a collective-bargaining agreement requiring an employer to contribute to a pension fund." *Id.* But here, WASCO does not challenge any provisions *in* the collective bargaining agreements, but instead offers conclusory allegations that the Fund is demanding payments *not provided for in* the collective bargaining agreements. *See* Countercl. ¶ 42. WASCO, therefore does not allege that any of the bargaining agreement provisions are illegal requiring court review prior to arbitration, as in *Kaiser Steel*.

Finally, WASCO argues that arbitration would be futile because it will not be able to vindicate its statutory rights in arbitration. *See* Defs.' Resp. Mot. to Dismiss Countercl. 6–7. The Court does not agree. As set forth above, Congress devised a scheme for resolving a dispute concerning withdrawal liability such as this one, and an arbitrator will best be able to determine whether the withdrawal liability payments at issue are in fact, inflated. *See* 29 U.S.C.

§ 1401(a)(3)(A).  Because all of WASCO's claims are based on such alleged inflation, which must be decided by an arbitrator in the first instance, the other claims are inextricably dependent upon the withdrawal liability claim, and will be able to be resolved, at least in part, in an MPPAA arbitration proceeding.

In sum, there has been no waiver of the arbitration requirement, there is no alleged illegality that would need to be first addressed by this Court prior to an arbitrator, and arbitration would not be futile.  Accordingly, WASCO's counterclaims must be dismissed because they all concern withdrawal liability and such concerns must first be addressed in arbitration as mandated by the MPPAA.

### C.  WASCO Has Failed to State a Claim Under the LMRA

The Trustees next argue that even if the LMRA counterclaim did not need to be brought first in arbitration, it would still have to be dismissed for failure to state a claim because WASCO has not pled a plausible entitlement to relief, and in any event, it would not be able to recover damages under the LMRA.  *See* Pls.' Mem. Supp. Mot. to Dismiss Countercl. 10–12.  WASCO counters that the Trustees are demanding or accepting payments contrary to the terms of the collective bargaining agreements at issue in this case.  *See* Defs.' Resp. Mot. to Dismiss Countercl. 7–8.  The Court finds that WASCO has only made conclusory allegations that the Trustees are demanding payments outside the written agreements it acknowledges are at issue here, and as such, its LMRA claim must be dismissed.

Section 186 of the LMRA "makes it unlawful for a labor organization or employee thereof to 'request, demand, receive or accept, or agree to receive, or accept, any payment, loan or delivery of any money' from the employer of workers that the organization represents or seeks to represent."  *Xin Wei Lin v. Chinese Staff & Workers' Ass'n*, 527 F. App'x 83, 87 (2d Cir.

2013) (quoting 29 U.S.C. § 186(b)(1)).  There are many exceptions to this rule, one of which is

where "with respect to money . . . paid to a trust fund established by such representative . . . *the*

*detailed basis on which such payments are to be made is specified in a written agreement with*

*the employer.*"  29 U.S.C. § 186(c)(5)(B) (emphasis added).  Thus, where there is a written

agreement in which "the detailed basis on which such payments are to be made" is specified, the

demand for payment is not unlawful under the LMRA.  *Cf. Producers Dairy Delivery Co., Inc. v.*

*W. Conference of Teamsters Pension Trust Fund*, 654 F.2d 625, 627 (9th Cir. 1981) ("It is true

that payments made other than in conformity with the provisions of a written agreement are

unlawful.").

      WASCO alleges that the Trustees' "actions in demanding and collecting payments not

provided for in the collective bargaining agreements between Wasco and the Union . . .

constitute a request or demand for or an acceptance of payments by an employer to an employee

representative the detailed basis for which was not set forth in a written agreement with the

employer as required by 29 U.S.C. § 186(c)(5)(B)."  Countercl. ¶ 42.  This allegation is

conclusory.  Here, there is a collective bargaining agreement, as WASCO admits in its Answer

and Counterclaim.  *See* Countercl. ¶ 33 ("Since at least the late 1970's, Wasco has been a party

to collective bargaining agreements with Bricklayers & Allied Craftworkers Local Union #5 of

Tennessee.  *These collective bargaining agreements provided for Wasco to make pension*

*contributions to the Fund at specified rates*.") (emphasis added).  WASCO had been paying the

amounts specified in those collective bargaining agreements for twelve months before this

lawsuit ensued, *see* Countercl. ¶ 36, and the Trustees brought this lawsuit seeking to enforce

those very agreements.  *See generally* Compl.  WASCO alleges no facts, other than its

conclusory allegation, showing that in trying to enforce the collective bargaining agreement, the

Trustees are taking "actions in demanding and collecting payments not provided for in the collective bargaining agreements." Countercl. ¶ 42. Moreover, if WASCO's argument is that the alleged inflated withdrawal liability amount constitutes a demand for payment outside the collective bargaining agreements, that issue again, as set forth above, must be raised in arbitration, as it pertains to the withdrawal liability determination. As the Trustees aptly note, pursuant to WASCO's theory, every dispute about the appropriate withdrawal liability due would also constitute an LMRA violation. That cannot be the law, and WASCO cites no case to support this novel theory. Thus, this count must be dismissed for both the reasons set forth above and because WASCO has alleged no facts that the Trustees are seeking payments outside the written agreements that WASCO acknowledges are at issue here.[5]

### D. WASCO Has Failed to Allege a Pattern of Racketeering Activity

The Trustees finally argue that WASCO has not alleged a "pattern of racketeering activity," because it has not alleged sufficient predicate acts under RICO, and even if it did, WASCO only alleges a single scheme, which is not enough to constitute a pattern under D.C. Circuit precedent. *See* Pls.' Mem. Supp. Mot. to Dismiss Countercl. 12–15. WASCO meanwhile argues that (1) it has sufficiently alleged a pattern of racketeering activity, and (2) that the single scheme cases are inapposite because it has sufficiently pled an ongoing, open-ended scheme. *See* Defs.' Resp. Mot. to Dismiss Countercl. 8–10. The Court agrees with the

---

[5]     Finally, and as WASCO has conceded, even if WASCO could state a claim on LMRA violation grounds, it would not be entitled to damages, as several circuits have expressly held that there is no private cause of action for damages under 29 U.S.C. § 186. *See, e.g.*, *Bakerstown Container Corp. v. Int'l Bhd. of Teamsters*, 884 F.2d 105, 107 (3d Cir. 1989) ("[C]ourts of appeals for several circuits have concluded that § 302 provides no private cause of action for damages resulting from violations of § 302 [of the LMRA].").

Trustees that WASCO's RICO claim must be dismissed for failure to allege a pattern of racketeering activity.

A plaintiff asserting a claim under RICO must allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Zernik v. U.S. Dep't of Justice*, 630 F. Supp. 2d 24, 27 (D.D.C. 2009) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991)). The RICO statute defines "pattern of racketeering activity" as requiring the commission of at least two predicate racketeering offenses within a ten year period. *See* 18 U.S.C. § 1961(5). "Predicate offenses satisfying the statute include acts punishable under certain state and federal criminal laws, such as mail and wire fraud." *Busby v. Capital One, N.A.*, 772 F. Supp. 2d 268, 281 (citing 18 U.S.C. § 1961(1)(B)). The predicate acts must be related and must "amount to [or] pose a threat of continued criminal activity." *Id.* at 281–82 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Moreover, the Supreme Court has explained that "'[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241.

WASCO's RICO claim is based on its allegations that the Trustees committed the indictable offenses of violating the LMRA, and that as a result of those violations, "[t]he Trustees have conducted and participated in the affairs of the Fund through a pattern of racketeering activity" and "conspired to conduct the affairs of the Fund through a pattern of racketeering activity." Countercl. ¶¶ 48–49. WASCO argues that "[t]he *counterclaim alleges multiple instances* of the Fund demanding and collecting contributions to which it was not entitled, within a ten-year period, in violation of LMRA § 302" and that a violation of LMRA § 302 is a predicate offense under RICO. *See* Defs.' Resp. Mot. to Dismiss Countercl. 8

(emphasis added).  As such, WASCO continues, it has sufficiently alleged a pattern of racketeering activity.

This argument fails for several reasons.  First, the multiple instances where the Fund demanded and collected those contributions were instances where the Fund wrote warning letters and sent notices to WASCO *to pay the statutorily mandated payments to the Fund*.  It cannot be the law that anytime a pension fund demands payments under ERISA, it is committing a predicate RICO offense.  The Court knows of no such case, and the defendants offer none.  Second, even if the alleged LMRA violations could constitute predicate offenses, there would only be one predicate offense—the LMRA violation—and not two predicate offenses as is required to satisfy the definition for pattern of racketeering activity.  *See* 18 U.S.C. § 1961(5).

Third, the alleged predicate act, the LMRA violation, does not amount to an allegation of "a pattern of racketeering activity," as required to survive a motion to dismiss, because it only comprises a single scheme.  The D.C. Circuit has held that where a plaintiff has alleged only a single scheme, with a single injury, and few victims, that "makes it virtually impossible for plaintiffs to state a RICO claim."  *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995).  As set forth above, WASCO's counterclaims all turn on its disagreement over the amount of the withdrawal liability payments made pursuant to the collective bargaining agreements it entered into with the IPF.  In other words, to the extent there is any scheme alleged here, there is only one scheme, and only one claim of harm stemming from that alleged scheme.  Other cases in this jurisdiction have found that where only one single scheme and all events surrounding it are alleged, that is not enough to constitute a pattern of racketeering activity.  For instance, in *Zernik*, the court found that even though the plaintiff had alleged seven predicate racketeering offenses to support his RICO claim, each one "related solely

to the compelled sale of plaintiff's house in 2007," and as such, the plaintiff failed "to allege a *pattern* of racketeering activity, as his claims relate[d] to a single alleged scheme, for which he was the sole injured party." 630 F. Supp. 2d at 27. Similarly, in *Busby*, the plaintiff alleged that the actions taken by the defendant with respect to foreclosing on her property formed the basis for "an ongoing, widespread scheme on the part of the defendants to unlawfully compel the sale of homeowners in the District of Columbia." 772 F. Supp. 2d at 282. This court found that the plaintiff's conclusory allegations that other D.C. homeowners had been similarly victimized was not enough to survive a motion to dismiss, given that the plaintiff's claim focused exclusively on action taken by defendants against her. *Id.* Likewise here, WASCO's allegations against the Trustees do not establish a "pattern of racketeering activity," because only one harm is alleged: having to pay an inflated withdrawal liability amount. Defendants do not identify other harms, schemes, or activities. As such, the RICO claims must be dismissed for failure to state a claim, as the defendants have not alleged a pattern of racketeering activity.

The defendants argue that "*Edmondson* does not establish a rigid test, but rather presents a flexible guide for analyzing RICO allegations on a case by case basis." Defs.' Resp. Mot. to Dismiss Countercl. 10 (citing *W. Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001)). The *Western Associates* court, in turn, explained that neither it nor *Edmonson* "establishes a *per se* rule for RICO pattern analysis," but instead endorses a "fluid, flexible, and commonsensical, rather than rigid or formulaic" approach. *Western Associates*, 235 F.3d at 637. Even under that flexible approach, the *Western Associates* court found that the district court did not err in ruling that Western failed to allege a pattern of racketeering activity because Western had "alleged only a single scheme, a singly injury, and a single victim (or single set of victims)." *Id.* at 634. In this case, regardless of the test formulation, applying a

commonsensical approach, the Court concludes that WASCO has failed to allege anything more than a single scheme and a single harm. Thus, WASCO has failed to allege anything that would plausibly state a RICO violation.

Finally, WASCO argues that the scheme here is allegedly ongoing, and open-ended, and thus, that any test related to a closed-ended continuity situation, such as the one applied in *Edmondson* and *Western Associates*, is inapplicable. *See* Defs.' Resp. Mot. to Dismiss Countercl. 9–10. Specifically, WASCO argues that "the Trustees are still trying to collect excess withdrawal liability based on improper contributions" and that this conduct is "likely to continue, both with WASCO and other employers, until a court halts the practice." Defs.' Resp. Mot. to Dismiss Countercl. 9. While WASCO makes this argument at the motion to dismiss stage, these conclusory allegations are not pled in the answer or counterclaim. Moreover, nowhere does WASCO explain how the Trustees' attempt to collect withdrawal payments via the statutorily-mandated channels is an unlawful practice because, as set forth above, the MPPAA contemplates a pay now, dispute later regime. *See Bd. of Trs. of Trucking Employees*, 983 F.2d at 507. As such, WASCO's RICO allegations fail to state a claim for which relief can be granted.

## IV. CONCLUSION

In sum, WASCO's counterclaims must be dismissed for failure to exhaust via the mandatory arbitration process. Moreover, WASCO has failed to state an LMRA claim because it admits that there is a written agreement here and provides only conclusory allegations that the Trustees have made demands outside those written agreements. Finally, WASCO has failed to state a RICO violation claim because it fails to allege a pattern of racketeering activity. For the foregoing reasons, the plaintiffs' (Trustees') motion to dismiss defendants' (WASCO's)

counterclaims is GRANTED.  An order consistent with this Memorandum Opinion is separately

and contemporaneously issued.

Dated:  June 13, 2014                                    RUDOLPH CONTRERAS
                                                         United States District Judge